**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

ELROY PHILLIPS and
SIXTORIA PHILLIPS,

Plaintiffs, **CASE NO.:______________**

v. **JURY TRIAL DEMANDED**

AT&T MOBILITY LLC and
AT&T, INC.,

Defendants.
______________________________/

FILED BY MEG D.C.
JUN 03 2024
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

**COMPLAINT FOR DAMAGES**

Plaintiff Elroy Phillips and Plaintiff Sixtoria Phillips, hereinafter referred to as ("Plaintiffs), in their pro se status brings this action against Defendant AT&T Mobility and Defendant AT&T, Inc. (collectively, "AT&T" or "Defendants"). Plaintiffs make the following allegations base on the personal knowledge and on information and belief.

## I. NATURE OF ACTION

1. About three years ago, AT&T—the country's largest wireless carrier learned that a well-known threat actor claimed to be selling a database containing the personal information of Plaintiffs and over 70 million AT&T customers. This information included Plaintiffs' names, address, phone numbers, Social Security numbers and date of birth. But instead of investigating the source and cause of the massive breach, AT&T denied the allegations, ignored the issue, and continued with operation. AT&T told one media outlet that "the information that appeared in an

internet chat room does not appear to have come for our systems."[1] And when questioned about its vendors, AT&T chose not to speculate: "Given this information did not come from us, we can't speculate on where it came from or whether it is valid."[2] AT&T attempted to fully wash its hands of the disaster and impending doom of the Plaintiffs.

2. Almost three years later, the same customer data from 2021 is no longer just for sale, it has been fully exposed on the Dark Web. Subsequently, after years of denial, AT& T has changed its tune and admitted that Plaintiffs' and approximately 73 million former and current AT&T customers' personal and sensitive information was released onto the Dark Web (the "Data Breach). According to AT&T, customers' impacted information included a combination of their "full name, email address, mailing address, phone number, social security number, date of birth, and AT&T account number and passcode" (collectively, "PII"), which AT&T collected as a condition of use of its services. This recent revelation marks a concerning turn of events.

3. Now, years later, AT&T still appears to be clueless as to the source of the breach. It was incumbent upon a telecom giant like AT&T to conduct a "robust investigation" into the data leak to determine who was responsible, where the data originated from, which customers were impacted, how the Data Breach occurred, and other key factors. But AT&T did not. Had it done so, the Plaintiffs could have attempted to adequately protect themselves. Instead, AT&T remained willfully blind.

4. This Data Brach and resulting injuries occurred because AT&T failed to implement reasonable security procedures and practices (including failing to exercise appropriate managerial

[1] Lawrence Abrams, AT&T denies data breach after hacker auctions 70 million user database, BLEEPING COMPUTER (Aug. 20, 2021, 9:43 AM), https://www.bleepingcomputer.com/news/security/atandt-denies-data-breach-afterhacker-auctions-70-million-users-database/.

[2] Id.

control over third-party partner's data security), failed to disclose material facts surround its deficient data security protocols, and failed to timely notify the Plaintiffs of the Data Breach.

5. As a result of AT&T's failure to protect the PII it was entrusted to safeguard, Plaintiffs have been exposed to identity theft and fraud, financial fraud and face a significant risk of further identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

## II. PARTIES

6. Plaintiff, Elroy Phillips is a citizen and resident of the state of Florida whose PII was compromised from/by AT&T.

7. Plaintiff, Sixtoria Phillips is a citizen and resident of the State of Florida whose PII was compromised from/by AT&T.

8. Defendant, AT&T Mobility LLC is a Delaware limited liability company with its principal place of business in Atlanta, Georgia.

9. Defendant, AT&T, Inc. is a Delaware corporation with its principal place of business in Dallas, Texas.

## III. JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action under the 28 U.S.C. § 1332 and Article III, Section 2, as the amount in controversy exceeds $75,000, exclusive of interest and cost and there exist a "diversity of citizenship" between the parties. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because all claims alleged herein form part of the same case or controversy.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because substantial parts of the events and omissions giving rise to this action occurred in this District, including

unknown actors accessing, copy, and exfiltrating the PII of AT&T here in West Palm Beach, Florida.

## IV. FACTUAL ALLEGATIONS

**Defendants' Privacy Practices**

12. AT&T is the largest wireless carrier in the United States, with 241.5 million subscribers as the end 2023. In connection with providing its wireless services, AT&T requires consumers to provide personal information, including but not limited to names, addresses, Social Security numbers, and dates of birth. As a result, when Plaintiffs contracted with AT&T's services, their highly sensitive PII is/was stored on AT&T's network servers.

13. Given the amount and sensitive nature of the data it collects; AT&T maintains policies explaining its privacy practices handling Plaintiffs' personal information. Through these policies, AT&T represents to Plaintiffs that it possesses robust security features to protect Plaintiffs PII and it takes their responsibility to protect PII seriously. For example, AT&T claims that it "work[s] hard to safeguard [Plaintiffs'] information using technology controls and organizational controls."[3] AT&T further instructs that it "limit[s] access to personal information to the people who need access for their jobs."[4] AT&T also promises that when customers PII is no longer needed for "business, tax or legal purposes," that it will "destroy it by making it unreadable or indecipherable."[5] And in the event of a data breach, AT&T will "notify [Plaintiffs] as required by law."[6]

14. Given AT&T's avowed experience in its field handling highly sensitive personal information, it understood the need to protect Plaintiffs' PII and prioritize data security.

---

[3] AT&T Privacy Notice, AT&T, http://about.att.com/privacy/privacy-notice.html (last visited May 15, 2024).
[4] Id.
[5] Id.
[6] Id.

**Hackers Auction PII of Over 70 Million AT&T Customers in August 2021**

15. AT&T learned of the Data Breach nearly three years ago. In August 2021, ShinyHunters, a notorious hacking group, offered "AT&T Database +70M (SSN/DOB)" on a hacker forum and marketplace.[7] ShinyHunters offered the database for a starting price of $200,000 with incremental increases of $30,000 and provided a same of decrypted values. The hackers stated they would sell immediately for $1 million.

16. Once learning of ShinyHunters claims, AT&T represented that the data did not appear to come from its servers.[8] When pressed about whether the information could have been stolen from a third-party partner, AT&T stated that it could not "speculate on where it came from or whether it is valid."[9]

19. Continuing with its willfully blind attitude, AT&T denied responsibility, ignored the disaster, and continued operations.

**The Data Breach**

20. Nearly three years later, another threat actor has claimed to have leaked the same data ShinyHunters attempted to sell in August 2021. On March 17, 2024, MajorNelson leaked the database obtained by ShinyHunters for free on a hacking forum.[10] This data includes names, addresses, mobile phone numbers, decrypted birth dates and Social Security numbers, and other information of the Plaintiffs. Bleeping Computer, a data breach media outlet, reviewed and confirmed the leaked data with several impacted individuals.

---

[7] Waqas, AT&T breach? ShinyHunters selling AT&T database with 70 million SSN,HACKREAD(Aug. 20, 2021).
[8] Lawrence Abrams, AT&T denies data breach after hacker auctions 70 million user database, BLEEPING COMPUTER (Aug. 20, 2021, 9:43 AM) www.bleepingcompter.com/news/security/atandt-denies-data-breach-after-hacker-
[9] Id.
[10] Lawrence Abrams, AT&T says leaked data of 70 million people is not from its system, BLEEPING COMPUTER (Mar. 17, 2024, 7:24 PM).

As it had now been exposed, AT&T finally acknowledged the legitimacy of the leaked customer data:

> AT&T has determined that AT&T data-specific fields were contained in a data set released on the dark web approximately two weeks ago. While AT&T has made this determination, it is not yet known whether the data in those fields originated from AT&T or one of its vendors. With respect to the balance of the data set, which includes personal information such as social security numbers, the source of the data is still being assessed.
>
> AT&T has launched a robust investigation supported by internal and external cybersecurity experts. Based on our preliminary analysis, the data set appears to be from 2019 or earlier, impacting approximately 7.6 million current AT&T account holders and approximately 65.4 million former account holders
>
> Currently, AT&T does not have evidence of unauthorized access to its systems resulting in exfiltration of the data set. The company is communicating proactively with those impacted and will be offering credit monitoring at our expense where applicable. We encourage current and former customers with questions to visit www.att.com/accountsafety for more information.
>
> As of today, this incident has not had a material impact on AT&T's operations.

21. Experts have connected the August 2021 auctioned information to the Data Breach. Troy Hunt, a cybersecurity researcher specializing in the leak of consumer data,[11] concluded that the data "closely resembles a similar data breach that surfaced in 2021 but which AT&T never acknowledged…"[12] Similar to Bleeping Computer, Hunt also verified the posted information with his 4.8 million subscribers, which confirmed that approximately 153,000 of them are part of the data set.[13]

22. Commentators on the article also noted that their stolen information appeared to have originated with AT&T.

---

[11] Matt O'Brien, *Have you been 'pwned' in a data breach? Hunt can tell,* AP (Dec. 5, 2017).
[12] https://apnews.com/article/att-data-breach-dark-web-passcodes-fbefr3afe
[13] http://www.troyhunt.com/inside-the-massive-alleged-att-data-breach

23. Demonstrating AT&T's negligence is easily done. The AT&T database that was originally offered for sale in 2021 was published on the Dark Web for free almost three years later. And within those three years, AT&T has still not determined whether its systems were impacted or whether the data originated from a third-party partner. Had AT&T took the 2021 allegations as seriously as it does collecting payment for its services, then it would have "launched a robust investigation supported by internal and external cybersecurity experts" years ago. Instead, what did AT&T do during those interim years? Nothing.

**The Data Breach was Foreseeable and Preventable**

24. Following the Data Breach, AT&T stated that it takes "cybersecurity very seriously and privacy is a fundamental commitment at AT&T."[14]

25. AT&T, like any company of its size that stores massive amounts of sensitive PII, should have had robust protections in place to detect and terminate a successful intrusion long before access and exposure of customer data. AT&T also should have exercised appropriate managerial control over their third-party partners' data security when it knew these partners stored its customers' PII during carrying out the business of their partnership. AT&T's failure to prevent the breach is inexcusable given its knowledge that it and its affiliates are prime targets for cyberattacks.

26. In 2022, the National Security Agency (NSA), the Cybersecurity and Infrastructure Security Agency (CISA), and the Federal Bureau of Investigation (FBI) coauthored the joint Cybersecurity Advisory explicitly highlighting "[t]elecommunications and network service provider targeting" by cyber actors.[15] The Advisory explains how cyber actors exploit and access telecommunication organizations and network service providers though the use of open-source

[14] People's Republic of China State-Sponsored Cyber Actors Exploit Network Providers and Devices, CISA.Gov.
[15] http://cyble.com/blog/i-s-telecommunications-companies-targeted-consumers-hit-

tools "that allows for the scanning of IP addresses for vulnerabilities." Once these cyber actors gain an initial foothold, they identify "critical users and infrastructure including systems critical to maintaining the security of authentication, authorization, and accounting."

27. In addition to the Advisory, a 2023 report from cyber intelligence firm Cyble noted that U.S. telecommunications companies are a lucrative target for hackers. According to the study, the majority of data breaches stem from third-party vendors. "These third-party breaches can lead to a larger scale supply-chain attacks and a greater number of impacted users and entities globally…"[16] So, whether the data breach occurred through AT&T's own systems or its third-party vendors, AT&T was responsible for the protection of customers' PII.

28. AT&T recognized these risks in its own regulatory filings. For instance, in its 2023 Annual Report, AT&T acknowledged the business risk of suffering a cyber security incident and the need to manage third-party risk from vendors. AT&T also had warnings from federal regulatory agencies, and it still failed to protect the PII of the Plaintiffs.

29. Aside from warnings from federal regulatory agencies and cyber intelligence firms, AT&T is no stranger to data breaches. Just a year ago, AT&T notified 9 million wireless customers that their customer information had been accessed in a breach of a third-party marketing vendor. And in 2014, AT&T settled a Federal Communications Commission investigation into privacy violations for $25 million. That investigation stemmed from the exposure of about 280,000 U.S. customers' names and full or partial Social Security numbers.

31. If not through its own history, AT&T surely understood the risk from its competitors. Considering recent high profile data breaches at other telecommunications companies, such as Xfinity (36,000,000 impacted, announced December 2023); T-Mobile (37,000,000 impacted,

[16] https://www.cnet.com/tech/mobile/at-t-vendor-data-breach-exposed-9-million-customer-account

announced January 2023); and US-Cellular (52,000 impacted, announced March 2023), among others, AT&T knew or should have known that its data and consumers' PII would be, or had already been, targeted by cybercriminals.

30. To prevent unauthorized access, CISA encourages organizations to:

• Conduct regular vulnerability scanning to identify and address vulnerabilities, particularly on internet-facing devices;

• Regularly patch and update software to latest available versions, prioritizing timely patching of internet-facing servers and software processing internet data;

• Ensure devices are properly configured and that security features are enabled;

• Employ best practices for use of Remote Desktop Protocol (RDP) as threat actors often gain initial access to a network through exposed and poorly secured remote services; and

• Disable operating system network file sharing protocol known as Server Message Block (SMB) which is used by threat actors to travel through a network to spread malware or access sensitive data.19 33. The CISA guidance further recommends use of a centrally managed antivirus software utilizing automatic updates that will protect all devices connected to a network (as opposed to requiring separate software on each individual device), as well as implementing a real-time intrusion detection system that will detect potentially malicious network activity that occurs prior to ransomware deployment.

31. AT&T knew of the importance of safeguarding PII and of the foreseeable consequences that would occur if their data security system was breached, including the significant costs that would be imposed on customers because of a breach.

32. Despite all the publicly available knowledge of the continued compromises of PII and despite holding the PII of millions of customers, AT&T failed to use reasonable care in maintaining the privacy and security of the PII of Plaintiffs and Plaintiffs.

33. Had AT&T implemented industry standard security measures, adequately invested in data security, and promptly investigated cybersecurity issues, unauthorized parties likely would not have been able to access AT&T's or its third-party vendors' systems and the Data Breach would have been prevented or much smaller in scope.

**Value of PII**

34. The PII of Plaintiffs remains of high value to criminals, as evidenced by the continued sale and trade of such information on underground markets found on the "dark web"— which is a part of the internet that is intentionally hidden and inaccessible through standard web browsers.

35. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.21 According to the Dark Web Price Index for 2021, payment card details for an account balance up to $1,000 have an average market value of $150, credit card details with an account balance up to $5,000 have an average market value of $240, stolen online banking logins with a minimum of $100 on the account have an average market value of $40, and stolen online banking logins with a minimum of $2,000 on the account have an average market value of $120. 22 Criminals can also purchase access to entire company data breaches from $900 to $4,500.23 Other sources show sensitive private information selling for as much as $363 per record.

36. Data sets that include PII demand a much higher price on the black market. For example, the information likely exposed in the Data Breach is significantly more valuable than the

loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts. The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

37. There is also an active and robust legitimate market for PII. In 2021, the data brokering industry alone was valued at $319 billion.26 In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.27 Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[17]

38. Because their PII has independent value, Plaintiffs must take measures to protect it including by, as AT&T's online notice instructs, placing "alerts" with credit reporting agencies, changing passcodes, and reviewing and monitoring credit reports and accounts for unauthorized activity, which may take years to discover and detect.

**Allegations Relating to Plaintiffs**

39. Plaintiff Elroy Phillips and Sixtoria Phillips lives and resides in West Palm Beach, Florida and has been customers of AT&T for their personal and business accounts since 2014

40. In connection with obtaining AT&T's services, Plaintiffs were required to provide highly sensitive personal information, such as their contact information, date of birth, Social Security number, and so on. AT&T also prompted Plaintiffs to create login credentials to access their accounts.

---

[17] Nielsen Computer & Mobile Panel, Frequently Asked Questions, NIELSEN, http://computermobilepanel.nielsen.com/ui/US/en/faqen.htm (last visited Mar. 6, 2024)

41. In the regular course of business, AT&T shared Plaintiffs' information with several third-party partners whom AT&T was obligated to verify their data security practices because those third parties stored the information AT&T collected.

42. Plaintiffs became aware of the data breach on April 1, 2024, and reviewed AT&T's online notice. The online notice recommends that customers take certain actions like resetting account passcodes and monitoring credit reports for activity and to detect errors. Furthermore, the online notice recommends that customers place a "fraud alert" on their credit report to detect any possible misuse of personal information.

43. As a result of the Data Breach, Plaintiffs have spent time and effort researching the breach and reviewing their financial statements for evidence of unauthorized activity, which they will continue to do indefinitely.

44. Plaintiffs suffered and continues to suffer emotional distress knowing that their highly personal information, such as their financial information and Social Security number, are no longer confidential and can be used for extortion, theft or fraud, and any number of additional harms against them for the rest of their life.

45. Because AT&T continues to store and share Plaintiffs' PII in the regular course of its business, they have a continuing interest in ensuring that the PII is protected and safeguarded from additional authorized access.

**<u>AT&T Failed to Comply with Federal Law and Regulatory Guidance</u>**

46. Federal agencies have issued recommendations and guidelines to help minimize the risks of a data breach for businesses holding sensitive data. For example, the Federal Trade Commission (FTC) has issued numerous guides for businesses highlighting the importance of reasonable data security practices, which should be factored into all business-related

decisionmaking. The FTC's publication Protecting Personal Information: A Guide for Business sets forth fundamental data security principles and practices for businesses to implement and follow as a means to protect sensitive data. Among other things, the guidelines note that businesses should (a) protect the personal customer information that they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems. The FTC guidelines further recommend that businesses use an intrusion detection system, monitor all incoming traffic for unusual activity, monitor for large amounts of data being transmitted from their system, and have a response plan ready in the event of a breach.

47. Additionally, the FTC recommends that organizations limit access to sensitive data, require complex passwords to be used on networks, use industry tested methods for security; monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.

48. The FTC has brought enforcement actions against businesses for failing to reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations. [18]

49. AT&T was fully aware of its obligation to implement and use reasonable measures to protect Plaintiffs' PII but failed to comply with these basic recommendations and guidelines that would have prevented this breach from occurring. AT&T's failure to employ reasonable measures

[18] FTC, *Privacy and Security Enforcement*, FTC.GOV, http://www.ftc.gov/news-events/media

to protect against unauthorized access to customer information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

50. Though limited detail is available on the Data Breach, how it occurred or the entity the information originated from, AT&T's failure to safeguard customers' PII suggests AT&T failed to fully comply with industry-standard cybersecurity practices, including, but not limited to, proper firewall configuration, network segmentation, secure credential storage, rate limiting, user-activity monitoring, data-loss prevention, encryption, intrusion detection and prevention, and exercising managerial control over third-party vendors' cybersecurity practice

**The Impact of the Data Breach on Plaintiffs**

51. AT&T's failure to keep Plaintiffs' PII secure has severe ramifications. Given the sensitive nature of the PII stolen in the Data Breach—names, date of birth, Social Security numbers, and potentially other sensitive information—hackers committed identity theft, financial fraud, and other identity-related fraud against Plaintiffs now and into the indefinite future.

52. As a result, Plaintiffs have suffered injury and face an imminent and substantial risk of further injury including identity theft and related cybercrimes due to the Data Breach. Indeed, Plaintiffs' PII have already been published to the Dark Web available for any cybercriminal to misuse.

53. As discussed above, the PII likely exposed in the Data Breach is highly coveted and valuable on underground markets as it will continue be used to commit identity theft and fraud. Malicious actors use PII to, among other things, gain access to Plaintiffs' bank accounts, social media, and credit cards. Malicious actors can also use Plaintiffs' PII to open new financial accounts, open new utility accounts, obtain medical treatment using victims' health insurance, file

fraudulent tax returns (which has already occurred), obtain government benefits, obtain government IDs, or create "synthetic identities."

54. Further, malicious actors may wait months or years to use the PII obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These actors will also re-use stolen PII, meaning individuals can be the victims of several cybercrimes stemming from a single data breach.

55. Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. According to the Government Accountability Office, which conducted a study regarding data breaches: "law enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

56. The unauthorized disclosure of the Plaintiffs' sensitive PII to data thieves also reduces its inherent value to its owner, which has been recognized by courts as an independent form of harm.39

57. Plaintiffs are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals

who are seeking to misuse it at the victim's expense. And here, Plaintiffs' PII is already available to criminal actors on the dark web.

58. As the result of the wide variety of injuries that can be traced to the Data Breach, Plaintiffs have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

59. the unconsented disclosure of confidential information to a third party;

60. losing the value of the explicit and implicit promises of data security;

61. identity theft and fraud resulting from the theft of their PII;

62. costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

63. anxiety, emotional distress, and loss of privacy;

64. costs associated with purchasing credit monitoring, credit freezes, and identity theft protection services;

65. unauthorized charges and loss of use of and access to their financial and investment account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;

66. lowered credit scores resulting from credit inquiries following fraudulent activities;

67. costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

68. the continued, imminent, and certainly impending injury flowing from potential fraud and identify theft posed by their PII being in the possession of one or many unauthorized third parties.

69. Plaintiffs have also suffered damages for failure to meet contractual obligations due to issues of fraud arising because of the Data Breach.

70. Had Plaintiffs known the truth about AT&T's data security practices—that it did not adequately protect and store PII or adequately monitor the data security of third-party partners—they would not have contracted wit AT&T or would have paid significantly less. As such, Plaintiffs did not receive the benefit of their bargain with AT&T because they paid for the value or service they did not receive.

71. Plaintiffs have a direct interest in AT&T's promises and duties to protect their PII, i.e., that AT&T not increase their risk of identity theft and fraud. Because AT&T failed to live up to its promises and duties in this respect, Plaintiffs seek the present value of identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by AT&T's wrongful conduct. Through this remedy, Plaintiffs seek to restore themselves as close to the same position as they would have occupied but for AT&T's wrongful conduct, namely their failure to adequately protect Plaintiffs' PII.

72. Plaintiffs further seek to recover the value of the unauthorized access to their PII permitted through AT&T's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of

the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non- practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiffs and Plaintiffs have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

73. AT&T's delay in disclosing the Data Breach and notifying victims also caused Plaintiffs harm. For example, the objective of almost every data breach is to gain access to an organization's sensitive data so that the data can be misused for financial gain. Despite the Data Breach occurring in 2021, AT&T still has not explained the precise nature of the attack, the identity of the hackers, or from whom consumers' PII originated. This is because AT&T ignored the 2021 claims that its customers' PII was being auctioned on the dark web. Had AT&T took the 2021 cybersecurity incident seriously and promptly conducted an adequate investigation, Plaintiffs'' PII likely would not have been exposed almost three years later. AT&T's decision to forgo an adequate investigation to discover these key facts is significant because affected individuals may take different precautions depending on the severity and imminence of the perceived risk. By waiting years to acknowledge, verify, and disclose the Data Breach, AT&T prevented victims from taking meaningful, proactive, and targeted mitigation measures that could help protect them from harm.

88. Because AT&T continue to hold the PII of customers, Plaintiffs and have an interest in ensuring that their PII is secured and not subject to further theft.

## CLAIMS FOR RELIEF

## COUNT I

### Negligence

74. Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

75. Defendant AT&T required Plaintiffs' PII as a condition to receiving AT&T's services. AT&T collected and stored this PII for commercial gain. AT&T collected, stored, and through the its partnership with third-party vendors, shared the data with these vendors for providing AT&T's services as well as commercial gain.

76. AT&T owed Plaintiffs, upon partnering with its vendors, a duty to supervise and ensure its vendors maintained adequate data security for the protection of Plaintiffs' PII within its control for the purpose of carrying out the business of the partnership consistent with industry standards. AT&T owed a duty to exercise reasonable care in protecting Plaintiffs' and Plaintiffs' PII from unauthorized disclosure or access. AT&T acknowledged this duty in its privacy policies describing its handling of PII, where they promised not to disclose PII without authorization.

77. AT&T owed a duty of care to Plaintiffs and Plaintiffs to provide adequate data security, consistent with industry standards, to ensure that AT&T's and its vendors' systems and networks adequately protected the PII.

78. AT&T owed a duty of care to Plaintiffs and Plaintiffs to remedy any flaws within their system without undue delay to alleviate the risk of compromising Plaintiffs' and Plaintiffs' PII.

79. AT&T duty to use reasonable care in protecting PII arises because of the parties' relationship, as well as common law and federal law, including the FTC regulations described above and AT&T's own policies and promises regarding privacy and data security.

80. AT&T knew, or should have known, of the risks inherent in collecting and storing PII in a centralized location for the purpose of carrying out the business of the partnership, its vendors' vulnerability to network attacks, and the importance of adequate security.

81. AT&T breached its duty to Plaintiffs in numerous ways, as described herein, including by:

- Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the PII of Plaintiffs and;
- Failing to ensure its vendors implemented adequate security systems, protocols, and practices sufficient to protect the PII of Plaintiffs and;
- Failing to supervise its vendors regarding vendors' data security systems, protocols, and practices when it knew or should have known those systems, protocols, and practices were inadequate;
- Failing to comply with industry standard data security measures for the telecommunications industry leading up to the Data Breach;
- Failing to comply with its own privacy policies;
- Failing to comply with regulations protecting the PII at issue during the period of the Data Breach;
- Failing to adequately monitor, evaluate, and ensure the security of their vendors' network and systems;
- Failing to recognize in a timely manner that PII had been compromised; and
- Failing to timely and adequately disclose the Data Breach.

82. Plaintiffs' PII would not have been compromised but for AT&T's wrongful and negligent breach of its duties.

83. AT&T's failure to take proper security measures to protect the sensitive PII of Plaintiffs as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access, copying, and exfiltrating of PII by unauthorized third parties. Given that telecommunications businesses are prime targets for hackers, Plaintiffs and are part of a foreseeable, discernible group that was at high risk of having their PII misused or disclosed if not adequately protected by AT&T.

84. It was also foreseeable that AT&T's failure to provide timely and forthright notice of the Data Breach would result in injury to Plaintiffs and .

85. As a direct and proximate result of AT&T's conduct, Plaintiffs have and will suffer damages including: (i) the loss of rental or use value of their PII; (ii) the unconsented disclosure of their PII to unauthorized third parties; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their PII; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their PII, which remains in AT&T's possession and is subject to further unauthorized disclosures so long as AT&T fails to undertake appropriate and adequate measures to protect it; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII for the rest of their lives; (ix) actual damages in the amount of $850,000 and (x) any nominal damages that may be awarded.

**COUNT II**
**Negligence Per Se**

86. Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

87. Section 5 of the Federal Trade Commission Act ("FTC Act") prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as AT&T, of failing to use reasonable measures to protect PII. 15 U.S.C. § 45(a)(1).

88. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

89. AT&T violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and failing to comply with applicable industry standards. AT&T's conduct was unreasonable given the nature and amount of PII they obtained, stored, and disseminated in the regular course of their business, and the foreseeable consequences of a data breach, including, specifically, the significant damage that would result to Plaintiffs . AT&T further violated Section 5 of the FTC Act by willfully ignoring earlier cybersecurity issues in pursuit of financial gain. Indeed, had AT&T recognized the cybersecurity issues in 2021, it would have likely affected AT&T's bottom line.

90. AT&T's violations of Section 5 of the FTC Act constitute negligence per se.

91. Plaintiffs are within the class of persons that the FTC Act was intended to protect.

92. The harm that occurred because of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs . As a direct and proximate

result of AT&T's negligence per se, Plaintiffs sustained actual losses of more than $850,000 and damages as alleged herein. Plaintiffs alternatively seek an award of nominal damages.

**COUNT III**
**Breach of Contract**

93. Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

94. AT&T disseminated a "Privacy Notice" to its customers that constitutes an agreement between AT&T and persons who provided their PII to AT&T, including Plaintiffs .

95. Plaintiffs formed a contract with AT&T and complied with all obligations under such contract when they provided PII to AT&T subject to the Privacy Notice.

96. AT&T promised in its Privacy Notice that it would AT&T claims that it "work[s] hard to safeguard [customers'] information using technology controls and organizational controls." AT&T further instructed that it "limit[s] access to personal information to the people who need access for their jobs." AT&T also promises that when customers PII is no longer needed for "business, tax or legal purposes," that it will "destroy it by making it unreadable or indecipherable." And in the event of a data breach, AT&T will "notify [customers] as required by law."

97. AT&T breached its agreements with Plaintiffs when AT&T allowed for the disclosure of Plaintiffs' PII without their authorization and in a manner that was inconsistent with the permissible authorizations set forth in Privacy Notice, as well as when it failed to maintain the confidentiality of Plaintiffs' PII.

98. As a direct and proximate result of these breaches, Plaintiffs sustained actual losses and damages as alleged herein, including that they did not receive the benefits of the bargains for which they paid. Plaintiffs alternatively seek an award of nominal damages.

## COUNT IV

### Breach of Implied Contract

99. Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs and asserts this claim in the alternative to his breach of contract claim to the extent necessary.

100. Plaintiffs were required to provide their PII to AT&T as a condition to receiving AT&T's services.

101. As part of these transactions, AT&T agreed to safeguard and protect the PII of Plaintiffs . Implicit in these transactions between AT&T was the obligation that AT&T would use the PII for approved business purposes only and would not make unauthorized disclosures of the information or allow unauthorized access to the information.

102. Additionally, AT&T implicitly promised to retain this PII only under conditions that kept such information secure and confidential and therefore had a duty to reasonably safeguard and protect the PII of Plaintiffs from unauthorized disclosure or access.

103. Plaintiffs entered into implied contracts with the reasonable expectation that AT&T's data security practices and policies, including adequate managerial supervision of vendors' data security, were reasonable and consistent with industry standards. Plaintiffs believed that AT&T would use part of the monies paid to AT&T under the implied contracts to fund adequate and reasonable data security practices to protect their PII.

104. Plaintiffs would not have provided and entrusted their PII to AT&T or would have paid less for AT&T's services in the absence of the implied contract between them and AT&T. The safeguarding of Plaintiffs' ' PII was critical to realizing the intent of the parties.

105. The nature of AT&T's implied promise itself—the subject matter of the contractual provision at issue—was to protect Plaintiffs' PII in order to prevent harm and prevent present and continuing increased risk.

106. AT&T breached its implied contract with Plaintiffs by failing to reasonably safeguard and protect Plaintiffs' PII, which was compromised because of the Data Breach.

**COUNT V**

**Declaratory Judgment**

107. Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

108. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

109. An actual controversy has arisen in the wake of the Data Breach regarding AT&T's present and prospective common law and other duties to reasonably safeguard PII and whether AT&T is currently maintaining data security measures adequate to protect Plaintiffs from further cyberattacks and data breaches that could compromise their PII.

110. AT&T still possesses PII pertaining to Plaintiffs and continues to share this PII with its vendors, which means Plaintiffs' ' PII remains at risk of further breaches because AT&T's data security measures remain inadequate. Plaintiffs continue to suffer injuries as a result of the compromise of their PII and remain at an imminent risk that additional compromises of their PII will occur in the future.

111. Pursuant to the Declaratory Judgment Act, Plaintiffs seeks a declaration that: (a) AT&T's existing data security measures do not comply with its obligations and duties of care; and

(b) in order to comply with their obligations and duties of care, (1) AT&T must have policies and procedures in place to ensure the parties with whom it shares sensitive personal information maintain reasonable, industry standard

security measures, including, but not limited to, those listed at (ii), (a)-(i), infra, and must comply with those policies and procedures; (2) Defendants must: (i) purge, delete, or destroy in a reasonably secure manner Plaintiffs' ' PII if it is no longer necessary to perform essential business functions so that it is not subject to further theft; and (ii) implement and maintain reasonable, industry-standard security measures, including, but not limited to:

A. Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on AT&T's systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

B. Engaging third-party security auditors and internal personnel to run automated security monitoring;

C. Auditing, testing, and training its security personnel regarding any new or modified procedures;

D. Encrypting PII and segmenting PII by, among other things, creating firewalls and access controls so that if one area of Defendants' systems is compromised, hackers cannot gain access to other portions of its systems;

E. Purging, deleting, and destroying in a reasonable and secure manner PII not necessary to perform essential business functions;

F. Conducting regular database scanning and security checks;

G. Conducting regular employee education regarding best security practices;

H. Implementing multi-factor authentication and POLP to combat system-wide cyberattacks; and

I. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## REQUEST FOR RELIEF WHEREFORE

**WHEREFORE**, Plaintiffs, respectfully requests the following relief:

A. That the Court grant permanent injunctive relief to prohibit and prevent AT&T from continuing to engage in the unlawful acts, omissions, and practices described herein;

B. That the Court award Plaintiffs compensatory, consequential, and general damages in the amount of $850,000.

C. That the Court award statutory damages, trebled, and/or punitive or exemplary damages, to the extent permitted by law;

D. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by AT&T as a result of their unlawful acts, omissions, and practices;

E. That Plaintiffs be granted the declaratory and injunctive relief sought herein;

F. That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

G. That the Court award pre-and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial in the instant action.

Dated: June 3, 2024

ELROY PHILLIPS
1103 35TH STREET
WEST PALM BEACH FL 33407
Tel. 561-301-8931
ephillipslaw@gmail.com

SIXTORIA PHILLIPS
1103 35TH STREET
WEST PALM BEACH FL 33407
Sphillips.chevy@gmail.com